**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.  _____

Stephen T. Hatch, derivatively, on behalf of ZYNEX, INC. f/k/a ZYNEX MEDICAL
HOLDINGS, INC.,

      Plaintiff,

v.

THOMAS SANDGAARD,
FRITZ G. ALLISON,
TAYLOR SIMONTON,
and MARY BETH VITALE,
      Defendants,


- and -

ZYNEX, INC., f/k/a ZYNEX MEDICAL HOLDINGS, INC., a Nevada Corporation,

      Nominal Defendant.


**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Stephen T. Hatch, by his undersigned attorneys, for his verified shareholder derivative complaint, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows:

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      This is a shareholder derivative action on behalf of nominal defendant Zynex, Inc. (formerly Zynex Medical Holdings, Inc.) (collectively "Zynex" or the "Company"), a Nevada corporation headquartered in Lone Tree, Colorado, seeking to recover for damages caused to the Company by its directors and/or senior officers who breached their fiduciary obligations to Zynex.  The defendants are certain of the Company's current and former officers and/or directors, including a majority of the Company's board of directors at the time this complaint was filed.

2.      Zynex engineers, manufactures, markets, and sells medical devices primarily in the United States for (i) electrotherapy pain relief and pain management and (ii) stroke and spinal cord injury rehabilitation.  The Company's medical device products are intended for pain management to reduce reliance on drugs and medications and to provide rehabilitation and increased mobility.  Zynex's medical device products purport to be cost effective when compared to traditional physical therapy, often resulting in better mobility, less pain, and increased potential for a patient to return to work and a fuller life significantly earlier than with traditional therapies alone.  Zynex's medical device products are subject to Food and Drug Administration ("FDA") regulation and approval.  The Company's products require a physician's prescription, authorization, or order before they can be dispensed in the United

2

States.  Zynex both sells and rents its products.  During the period May 21, 2008 through March 31, 2009 (the "Relevant Period"), a majority of Zynex's revenue was derived from private health insurance carriers with insurance plans on behalf their insureds.  The Company recognizes revenue when a product is shipped and the customer's insurance is verified, and not when the Company actually receives payment by insurers or patients.

3.        Zynex purported to experience dramatic growth during each of the first three quarters of fiscal year 2008, spurred primarily by an increase in prescriptions for rentals and purchases of the Company's electrotherapy products.  During the Relevant Period, the Company routinely touted the number of Zynex products ordered and the amount of top-line revenue recognized from those shipments.  According to the Company, this increase in product orders resulted from an expansion of the Company's sales force, greater awareness of the Company's products by end-users and physicians, growing market penetration, and increased rental income from the greater number of Zynex products placed in use during prior periods.

4.        On April 1, 2009, Zynex revealed that adjustments to the Company's allowance for provider discounts, accounts receivable, and net revenues for the first three quarters of fiscal year 2008 necessitated restatement of the Company's financial statements for such periods and that financial statements and press releases covering that period "should not be relied upon." These financial results were included in quarterly reports on Forms 10-Q as well as in quarterly earnings press releases.  Defendants made, approved, and falsely certified these earnings announcements and statements in breach of their fiduciary duties owed to Zynex.

5.      On April 15, 2009, Zynex filed a Form 10-K with the U.S. Securities & Exchange Commission ("SEC") containing a restatement of the Company's quarterly financial results for the first three quarters of fiscal year 2008, ended March 31, 2008, June 30, 2008, and September 30, 2008.

6.      The restatement resulted in a reduction of reported net revenues and related net accounts receivable of approximately $5.1 million.  According to Zynex, the restatement was necessary "based on a re-evaluation of the estimated allowance for provider discounts that management believes should have been utilized in 2008."  The Company, admitting it applied improper provider discount rates, further stated that the "change in the provider discount rates is based on management's analysis of business conditions, recent rates of collection and additional methodologies that the Company applied in estimating these rates at year end, which management believes are more accurate than previously applied rates during the quarterly periods in 2008.  Zynex's allowance for provider discounts is recorded to account for the risk of non-payment arising from reimbursements from insurance providers that are less than amounts claimed, amounts subject to patients' deductibles and benefit denials."  In essence, during the first three quarters of fiscal year 2008, Zynex recorded and reported revenue on product shipments for which insurers had not authorized billing and for which insurers had never agreed to pay the amounts billed.  Consequently, Zynex was only collecting a small fraction of the amounts billed and publicly reported as revenue.

7.      As a result of defendants' actions, Zynex's stock price traded at inflated levels during the Relevant Period – as high as $6.14.  After the full truth emerged to the market, Zynex traded at approximately $0.50 per share.

8.      The current and former officers and directors of Zynex named herein owed fiduciary duties of care and loyalty to the Company, including a duty to ensure that the Company maintained sufficient and effective internal controls over the Company's financial reporting processes to maintain the accuracy of its reported financial results.  Further, all of the defendants had the responsibility to ensure that truthful statements were made to shareholders and to act in the face of clear warning signs.  As alleged herein, in utterly failing to do so, each defendant acted in bad faith, faces a substantial likelihood of liability for breach of fiduciary duty, and is therefore interested in the subject matter of this case.

9.      As was publicly revealed on November 3, 2008 in the Company's Form 8-K filed with the SEC, prior to filing certain of the false financial statements alleged herein, defendants were already on notice that insurers had not authorized billing for certain of Zynex's products and had never agreed to pay the amounts billed.  The Company's largest customer, Anthem Blue Cross and Blue Shield ("Anthem"), claimed that Zynex improperly billed and overcharged Anthem for Zynex products.  The settlement eventually reached between Zynex and Anthem on November 18, 2008 caused the Company to set aside approximately $2 million in revenues through a $1 million direct refund to Anthem and Zynex's agreement to not recognize $1 million of revenue for the rental of Zynex products to Anthem insureds for the third quarter of 2008.  Notwithstanding this revelation, defendants failed to take the necessary steps to fix such

problems throughout the Company, even as the Company's growth put more and more pressure on its internal controls.  Indeed, following the Anthem settlement, defendants caused the Company to issue its third quarter of fiscal year 2008 financial results, yet again reporting unrecognizable and unrealistic revenue which would be subsequently restated in April 2009. Defendants also assured shareholders that the Company's internal controls were adequate and sufficient, and that the Company's financial statements were correct.

10.     Thus, even while on notice of serious internal control problems and the need for dramatic improvements, defendants failed to promptly remediate the deficiencies known to them, leading to the restatement.

11.     As a result of defendants' breaches of fiduciary duties, Zynex disseminated nine months of false financial results.  These false financial results have damaged Zynex's credibility, as reflected in a $19 million market capitalization loss following the disclosure of the overstated net revenues and related net accounts receivable.  In addition, the Company has also been exposed to significant reputational harm, as well as to substantial expenses and potentially massive liability arising out of a securities fraud class action filed in United States District Court in Colorado by purchasers of the Company's securities during the financial reporting periods for which the Company's results were restated.

12.     Under these circumstances, a shareholder demand on the Zynex board of directors to bring the asserted claims would be futile, and is therefore excused.  The directors further lack independence and would never act in a way that might threaten their substantial compensation, as alleged herein.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of Colorado, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Zynex maintains its principal place of business in this District, one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff Stephen T. Hatch**

16.     Plaintiff Stephen T. Hatch was a shareholder of Zynex during the Relevant Period, and since becoming a shareholder, plaintiff has continuously held such shares.  Plaintiff is a citizen of Washington. *See* Verification, Exhibit 1.

**Nominal Defendant Zynex**

17.     Nominal defendant Zynex is a Nevada corporation headquartered at 9990 Park Meadows Dr., Lone Tree, Colorado 80124.  Zynex sells and rents electrotherapy, stroke, and spinal cord rehabilitation medical device products which require prescriptions.  The Company's shares are listed on the Over-The-Counter Bulletin Board under the symbol "ZYXI."  Zynex is named in this complaint as a nominal defendant.  Currently, Zynex has more than 30 million shares outstanding.

18.     At the time this complaint was filed, the Company's board of directors had four members, a majority of whom are named as defendants herein.

**Individual Defendants**

19.     Defendant Thomas Sandgaard ("Sandgaard") is Zynex's Chief Executive Officer, Chairman of Zynex's board of directors, and President.  Sandgaard founded Zynex and has served in these roles since the Company's inception in 1996.  Sandgaard knowingly: (i) signed false financial statements that did not properly account for Zynex's revenues; (ii) failed to maintain adequate internal controls with respect to Zynex's accounting for revenue transactions;

and (iii) signed false statements with respect to Zynex's internal controls over financial reporting. For fiscal year 2008, Sandgaard received cash and stock compensation of $363,296. For fiscal year 2009, Sandgaard received cash and stock compensation of $460,389. For fiscal year 2010, Sandgaard received cash and stock compensation of $345,454. Upon information and belief, Sandgaard is a citizen of Colorado.

20.     Defendant Fritz G. Allison ("Allison") served as Zynex's Chief Financial Officer ("CFO") since February 19, 2007 until resigning on August 23, 2010. Allison was Zynex's CFO throughout the Relevant Period. Allison knowingly: (i) signed false financial statements that did not properly account for Zynex's revenues; (ii) failed to maintain adequate internal controls with respect to Zynex's accounting for revenue transactions; and (iii) signed false statements with respect to Zynex's internal controls over financial reporting. For fiscal year 2008, Allison received cash and stock compensation of $143,371. For fiscal year 2009, Allison received cash and stock compensation of $167,800. For fiscal year 2010, Allison received cash and stock compensation of $174,583. Upon information and belief, Allison is a citizen of Colorado.

21.     Defendant Taylor Simonton ("Simonton") was appointed to the Zynex board of directors by Sandgaard in October 2008 and continues to serve as a director. Simonton is a member and Chair of the Audit Committee. The Company's board of directors has designated Simonton as one of Zynex's "audit committee financial experts" under SEC rules. Since joining the Zynex board of directors, Simonton knowingly: (i) reviewed and approved false financial statements that did not properly account for Zynex's revenues; and (ii) reviewed and approved ineffective internal controls with respect to Zynex's accounting for revenue transactions. For

fiscal year 2008, Simonton received cash and stock compensation of $51,536.  For fiscal year

2009, Simonton received cash and stock compensation of $51,000.  For fiscal year 2010,

Simonton received cash and stock compensation of $57,665.  Upon information and belief,

Simonton is a citizen of Colorado.

22.     Defendant Mary Beth Vitale ("Vitale") was appointed to the Zynex board of

directors by Sandgaard in October 2008 and continues to serve as a director.  Vitale is a member

of the Audit Committee.  The Company's board of directors has designated Vitale as one of

Zynex's "audit committee financial experts" under SEC rules.  Since joining the Zynex board of

directors, Vitale knowingly: (i) reviewed and approved false financial statements that did not

properly account for Zynex's revenues; and (ii) reviewed and approved ineffective internal

controls with respect to Zynex's accounting for revenue transactions.  For fiscal year 2008,

Vitale received cash and stock compensation of $42,736.  For fiscal year 2009, Vitale received

cash and stock compensation of $34,500.  For fiscal year 2010, Vitale received cash and stock

compensation of $42,165.  Upon information and belief, Vitale is a citizen of Colorado.

23.     Defendants Sandgaard, Allison, Simonton, and Vitale are referred to herein as the

"Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     The Individual Defendants, by virtue of their positions as officers and/or directors

of Zynex, and because of their ability to control the business and corporate affairs of the

Company, owed the Company and its shareholders the fiduciary obligations of good faith, trust,

loyalty, diligence, and due care, and the duty of full and candid disclosure of all material facts

related thereto.  The Individual Defendants were required to use their utmost ability to control

and manage the Company in a fair, just, honest, and equitable manner.

25.     The Individual Defendants were required to act in furtherance of the best interests

of the Company and its shareholders so as to benefit all shareholders equally and not in

furtherance of their personal interest or benefit.  Each director and officer of the Company owed

to Zynex and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the affairs of the Company and in the use and preservation of its property and

assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Zynex, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.  Because of their executive, managerial,

and/or directorial positions with Zynex, each of the Individual Defendants possessed the

authority to control the contents of its reports, press releases, and presentations to securities

analysts and the investing public.  The Individual Defendants were required to exercise

reasonable care and prudent supervision over the dissemination of information concerning the

business, operations, forecasts, and financial reporting of Zynex.

27.     Each of the Individual Defendants directly participated in the management of the

Company and/or was involved in drafting, producing, reviewing, and/or disseminating certain of

the false and misleading statements alleged herein, and/or was aware that these statements were

being issued regarding the Company's business operations and approved or ratified these

statements.  The Individual Defendants were provided with copies of the Company's reports and

press releases alleged herein prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants were prohibited from engaging in unlawful corporate conduct, such as violations of the laws, rules, and regulations applicable to Zynex and its business.

28.     Because of each of the Individual Defendants' positions with Zynex, each knew and had access to non-public information about the ongoing business operations of Zynex, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided in connection therewith.  The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Zynex and its faulty revenue recognition practices.

29.     Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, shareholders and the public, and that the positive representations that were being made were false and misleading.

30.     Because of their positions of control and authority as directors and/or officers of Zynex, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     As members of the Audit Committee, pursuant to its charter, defendants Simonton and Vitale were responsible for reviewing the integrity of Zynex's auditing, accounting, and reporting processes and consideration and approval of appropriate changes.  Defendants Simonton and Vitale were also responsible for reviewing Zynex's financial reports and other

financial information provided to shareholders and filed with the SEC, in addition to reviewing Zynex's internal controls.  By virtue of their assigned duties and responsibilities, the Audit Committee defendants had a special relationship with the Company.  The Audit Committee Charter, in effect since October 6, 2008, specifically provides that the committee's "primary responsibility…is to oversee the Company's financial reporting processes on behalf of the Board and report the results of its activities to the Board."  The charter further provides that the "Committee, in carrying out its oversight responsibilities, will assess the Company's systems of internal accounting and financial controls, any internal audit process…and the overall integrity of the Company's financial statements and information systems."  Further, the audit committee was "empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company."  Among the "principal recurring processes of the Committee" was the duty to "[r]eview with management and the independent auditor the interim financial statements to be included in the Company's Quarterly Report on Form 10-Q."  Also included in the "principal recurring processes of the Committee" was the duty to "[d]iscuss with management…the quality and adequacy of the Company's internal controls…"

32.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to

provide the highest quality performance of their business and avoid wasting the Company's assets;

b. exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

c. properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's revenues;

d. remain informed as to how Zynex conducted its operations and recognized revenue, and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

e. maintain and implement an adequate system of controls and information systems, such that no officer, director, or employee of the Company would make false statements about Zynex to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and profit, by insider stock trading or otherwise.

## SUBSTANTIVE ALLEGATIONS

### A.    Zynex's Business

33.    Zynex engineers, manufactures, markets, and sells medical devices primarily in

the United States for (i) electrotherapy pain relief and pain management and (ii) stroke and spinal

cord injury rehabilitation.  The Company's medical device products are intended for pain

management to reduce reliance on drugs and medications and to provide rehabilitation and

increased mobility.  Zynex's medical device products purport to be cost effective when

compared to traditional physical therapy, often resulting in better mobility, less pain, and

increased potential for a patient to return to work and a fuller life significantly earlier than with

traditional therapies alone.  Zynex's medical device products are subject to FDA regulation and

approval.  The Company's products require a physician's prescription, authorization, or order

before they can be dispensed in the United States.  Zynex both sells and rents its products.

During the Relevant Period, a majority of Zynex's revenue was derived from private health

insurance carriers with insurance plans on behalf their insureds.  Zynex received its remaining

revenue during the Relevant Period from Medicare, Medicaid, worker's compensation agencies,

attorneys representing injured patients, hospitals, and U.S. and international distributors.

34.    Sandgaard dominates and controls Zynex, including its board of directors.

Sandgaard was the Company's sole director until October 6, 2008, when the size of Zynex's

board of directors increased to three directors.  Previously, Sandgaard was Zynex's sole

shareholder, and Sandgaard held 61% of the Company's stock during the Relevant Period.

Zynex's 10-K Report for fiscal year 2008, filed with the SEC on April 15, 2009, disclosed that

Zynex's "success depends to a significant extent upon the continued service of Mr. Thomas Sandgaard." The Company's 10-K Report for fiscal year 2008 also revealed that Sandgaard wields "the ability to control substantially all matters submitted to [the Company's] stockholders for approval, including: Election of [Zynex's] board of directors; Removal of any of [Zynex's] directors; Amendment of [Zynex's] certificate of incorporation or bylaws; and Adoption of measures that could delay or prevent a change in control or impede a merger, takeover or other business combination involving [Zynex]." The Company's 10-K Report for fiscal year 2008 also disclosed that, "Mr. Sandgaard, because of his stock ownership and position as director, may be considered a 'parent' of the Company."

35.     As revealed in the Company's Form 10-K filed with the SEC on April 17, 2007, Zynex has previously struggled with its internal controls. The 10-K Report identified a material weakness in the Company's internal control over financial reporting relating to inventory, but represented that the Company had undertaken remediation efforts to correct such deficiencies and that it would "continue to review its internal controls and procedures and [would] take further action as appropriate."

36.     Leading up to and during the Relevant Period, Zynex added significant numbers of sales representatives. Zynex's rapid sales representative growth is matched by its dramatic growth in revenues during the first three quarters of fiscal year 2008, spurred primarily by an increase in prescriptions for rentals and purchases of the Company's electrotherapy products. Indeed, the Company routinely touted during the Relevant Period the number of Zynex products ordered and the amount of top-line revenue recognized from those shipments. According to the

Company, this increase in product orders resulted from an expansion of the Company's sales

force, greater awareness of the Company's products by end-users and physicians, growing

market penetration, and increased rental income from the greater number of Zynex products

placed in use during prior periods.  In the first three quarters of fiscal year 2007, Zynex

generated $1.34 million, $1.51 million, and $2.10 million in revenues and $232,000, $352,000,

and $614,000 in net income, respectively.  In the first three quarters of fiscal year 2008, Zynex

initially reported revenues totaling $3.74 million, $5.05 million, and $3.50 million and $1.19

million, $1.85 million, and $206,000 in net income, respectively.  Thus, in the course of just one

fiscal year, combined quarterly revenue growth increased dramatically almost 2.5 times over and

combined quarterly net income nearly tripled over a 9-month span, as depicted below:

| | Net Rental and Sales Revenue | Net Income | *Before Restatement | Net Rental and Sales Revenue | Net Income |
|---|---|---|---|---|---|
| Q1 2007 | $1,336,731 | $231,681 | Q1 2008 | $3,741,028 | $1,192,991 |
| Q2 2007 | $1,505,207 | $351,548 | Q2 2008 | $5,047,635 | $1,852,212 |
| Q3 2007 | $2,104,446 | $614,465 | Q3 2008 | $3,502,994 | $205,837 |
| Total | $4,946,384 | $1,197,694 | Total | $12,291,658 | $3,251,040 |

37.     During the relevant period, Zynex purported to recognize revenue when each of

the following conditions was satisfied: (i) a contract or sales arrangement existed; (ii) products

had been shipped and title had transferred or rental services had been rendered; (iii) the price of

the products or services was fixed or determinable; and (iv) collectability was reasonably

assured. Accordingly, Zynex recognized revenue when the product shipped and the customer's insurance was verified, and not when Zynex actually received payment. The Company's sales and rental income was reported net of deductions for bad debt and estimated insurance company reimbursement deductions. The deductions are known throughout the healthcare industry as "contractual adjustments" and describe the process whereby the healthcare insurers unilaterally reduce the amount they reimburse the Company for its products as compared to the rental rates and sales prices charged.

**B.      The Individual Defendants Caused Zynex to Issue False and Misleading Statements During the Relevant Period**

38.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primarily liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties. During relevant times, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Zynex's reported revenue and earnings were overstated due to the Company's false accounting; (ii) conceal the fact that the Company was improperly portraying its revenue recognition practices and violating Generally Accepted Accounting Principles ("GAAP"); and (iii) conceal the fact that the Company lacked adequate internal and financial controls. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully misrepresent its business prospects and release improper statements.

39.     As a result of the defendants' positions with Zynex during the Relevant Period, each knew and had access to this non-public information about the business of Zynex and its improper revenue recognition practices, as well as about its finances, markets, and business prospects, via access to internal corporate documents (including operating plans, budgets, forecasts, and reports of actual operations), conversations and connections with other corporate officers and employees, and attendance at management and/or board meetings and committees thereof.

40.     On May 21, 2008, the first day of the Relevant Period, defendants Sandgaard and Allison caused the Company to report its first quarter 2008 financial results on Form 10-Q filed with the SEC and an accompanying press release.  For the first quarter of 2008, ended March 31, 2008, Zynex reported collective net rental and sales revenue of $3,741,028 and net income of $1,192,991.  Zynex's financial results, as stated in its SEC filing, were false and misleading when made because:

    a.     Zynex overstated its collective net rental and sales revenue by $1.15 million;

    b.     Zynex overstated its net income by approximately $960,000;

  c.  Zynex's revenue recognition practices violated GAAP and materially

    deviated from its stated practices; and

  d.  the Company lacked adequate internal and financial controls throughout

    the Relevant Period.

41.  The Company's May 21, 2008 press release, which defendants Sandgaard and

Allison caused the Company to issue, confirmed the false and misleading first quarter of 2008

financial results and contained additional false and misleading statements.  In the press release,

Sandgaard stated, in pertinent part: "We are very pleased to report ***continued increases in***

***revenue*** and net income as a result of executing of our sales and marketing plan." (Emphasis

added.)  As was revealed in the Company's April 15, 2009 restatement, Zynex's actual first

quarter of 2008 revenue was $2,588,720 – resulting in a decrease of the Company's revenue as

compared to the Company's fourth quarter of 2007 revenue of $3,101,869.

42.  On August 14, 2008, defendants Sandgaard and Allison caused the Company to

report its second quarter 2008 financial results on Form 10-Q filed with the SEC and an

accompanying press release on August 15, 2008.  For the second quarter of 2008, ended June 30,

2008, Zynex reported collective net rental and sales revenue of $5,047,635 and net income of

$1,852,212.  Zynex's financial results, as stated in its SEC filing, were false and misleading

when made because:

  a.  Zynex overstated its collective net rental and sales revenue by $2.01

    million;

b.      Zynex overstated its net income by approximately $1.56 million;

c.      Zynex's revenue recognition practices violated GAAP and materially deviated from its stated practices; and

d.      the Company lacked adequate internal and financial controls throughout the Relevant Period.

43.     The Company's August 15, 2008 press release, which defendants Sandgaard and Allison caused the Company to issue, confirmed the false and misleading second quarter of 2008 financial results.

44.     On November 3, 2008, in its Form 8-K filed with the SEC, Zynex partially revealed that it had been improperly billing and charging at least one of its top customers, Anthem, and that Anthem sought a significant refund.  In the Form 8-K, the Company, in pertinent part, stated:

> Zynex, Inc. declined on October 31, 2008 a settlement offer regarding a refund request by Anthem Blue Cross and Blue Shield ("Anthem"), a major health insurance provider.  The refund claim concerns payments previously made by Anthem for certain medical devices (the "devices") rented or sold to insureds of Anthem by Zynex from September 1, 2007 through July 31, 2008.  Despite Anthem's paying claims for such devices, including some that were individually subject to an Anthem review process and resulted in decisions favorable to Zynex, Anthem claimed in a retrospective review that the devices were considered investigational or not medically necessary under a medical policy statement of Wellpoint, Inc. (the parent entity) and therefore not eligible for payment.  As a result, Anthem now claims that it should receive a refund of approximately $1,065,000.  Zynex met with representatives of Anthem for a reconsideration of the claim; however, Anthem continues to assert the claim.  Anthem offered to allow payments over 12 months without interest if Zynex agreed on October 31, 2008 to pay the claimed amount.  However, Zynex has indicated to Anthem that it

is appealing the claim to a higher authority at Anthem.  Zynex will consider other options if the appeal is not successful.

Anthem is also indicating that it will not pay current outstanding amounts with respect to such devices, which receivables are estimated to be approximately $700,000 as of June 30, 2008.  Pending the appeal, Zynex is not recording any revenues from rentals or sales of the devices to Anthem insureds since July 1, 2008.  Other products of Zynex are now provided to Anthem insureds who previously may have been prescribed the devices subject to the claim.

As previously disclosed, Zynex has a line of credit with Marquette Health Care Finance.  This loan facility requires the consent of Marquette for Zynex to make or settle the claim made by Anthem and to reduce or waive any accounts receivable that would otherwise be owed by Anthem.  Marquette may assert that Anthem's claim constitutes a breach of representations and warranties made to Marquette, which would be an event of default; it may also assert that there has been a material adverse change which would affect Marquette's obligations to make any advances.  Zynex has commenced discussions with Marquette regarding the claim.  There is, however, no assurance that Zynex will be able to maintain the loan facility in place or obtain the approval of Marquette for any potential future payments to Anthem.

The amounts described above are pre-tax.  Nevertheless, payments that might be made to Anthem as a result of the claim, and any changes to or termination of the Marquette line of credit, could have a material impact on the cash flow and liquidity of Zynex.

Zynex has an agreement (terminable by either party upon advance notice) with Anthem making Zynex part of the Anthem network.  Although less advantageous, Zynex can provide services to Anthem insureds on an out of network basis, if needed.  Neither Anthem nor Zynex has indicated that it will terminate this agreement.

Anthem has been and continues to be one of the largest health insurers in terms of payments to Zynex for the rental and sale of its products.  Zynex continues to provide a variety of its devices to Anthem insureds, including devices which may be used to treat insureds with the same medical conditions as those using devices subject to the claim.

45.    Although the Company had now partially revealed that the Individual Defendants

had caused the Company to engage in an improper billing and charging scheme of Anthem, the

Company's previous statements regarding its financial results for the first and second quarters of

2008 remained materially false and misleading because such financial results remained overstated.  Moreover, notwithstanding having been put on notice that the Company's leading customer demanded rebates and credits amounting to millions of dollars as a result of Zynex's improper billing practices, the Individual Defendants continued to conceal and misrepresent the Company's actual financial condition and ignored the Company's deficient internal controls.

46.     Thereafter, on November 19, 2008, the Individual Defendants, including Simonton and Vitale, caused the Company to report its third quarter 2008 financial results on Form 10-Q filed with the SEC and an accompanying press release on November 20, 2008.  For the third quarter of 2008, ended September 30, 2008, Zynex reported collective net rental and sales revenue of $3,502,994 and net income of $205,837.  Zynex's financial results, as stated in its SEC filing and press release, were false and misleading when made because:

a.     Zynex overstated its collective net rental and sales revenue by $1.30 million;

b.     Zynex overstated its net income by approximately $570,000, resulting in a net loss;

c.     Zynex's revenue recognition practices violated GAAP and materially deviated from its stated practices; and

d.     the Company lacked adequate internal and financial controls throughout the Relevant Period.

47.    The Company's Form 10-Q for the third quarter of 2008 and accompanying

November 20, 2008 press release also revealed that the settlement of Anthem's claim regarding

Zynex's improper overbilling for Zynex products cost the Company in excess of $2 million.  The

Company's Form 10-Q stated, in pertinent part:

> The Company received and has settled a refund claim by Anthem Blue Cross
> Blue Shield which originally concerned payments previously made by Anthem for
> certain medical devices (the "devices") rented or sold to insureds of Anthem by
> the Company through July 31, 2008.  In the settlement, the Company agreed to
> pay Anthem a total of $679,930 over 12 months and waive rights to payments of
> outstanding billings for the devices provided to Anthem's insureds subsequent to
> September 1, 2007 through September 30, 2008.  Accounts receivable for these
> billings were approximately to be $329,664, net of contractual allowances, as of
> June 30, 2008.  Under the settlement, the Company will initially pay $17,770
> before the end of 2008 and will monthly make a payment of $55,180 on the first
> day of each month commencing December 1, 2008 and ending November 1,
> 2009.  The liability of $679,930 is recorded in other accrued liabilities on the
> Company's Condensed Consolidated Balance Sheet as of September 30, 2008.
> The Company may request that patients voluntarily return devices which were the
> subject of the settlement, but the Company is not doing so if the return of the
> equipment would interfere with the treatment of the patient.
>
> The Company recognized no revenue in the third quarter of 2008 relating to the
> devices rented or sold to insureds of Anthem.
>
> The Company wrote off the accounts receivable ($329,664) from Anthem against
> the allowance for provider discounts for the devices, which receivables were
> unpaid and arose prior to July 1, 2008. The Company also charged the amount to
> be repaid to Anthem ($679,930) against the allowance for provider discounts. The
> Company records its normal provision for provider discounts as direct reductions
> of rental and sales revenue (see Note 2); however, because of the size and
> retrospective nature of the Anthem settlement ($1,009,594 in total), this change in
> estimate has been displayed as an additional provision and as a separate line
> reducing total revenue in the Company's Condensed Consolidated Statement of
> Operations.
>
> Although Anthem had paid claims for the devices, including some that were
> individually subject to an Anthem review process and resulted in decisions
> favorable to the Company, Anthem claimed in a retrospective review that the
> devices were considered investigational or not medically necessary under a

medical policy statement of its parent entity and therefore not eligible for payment. Anthem originally claimed that it should receive a refund of approximately $1,065,000. The Company met with representatives of Anthem for reconsideration of the claim. Anthem continued to assert the claim, and on October 31, 2008, the Company gave notice to appeal the claim to a higher authority at Anthem. On November 18, 2008, the Company and Anthem executed an agreement for the settlement as described above.

Anthem has been and continues to be one of the largest health insurers in terms of payments to the Company for the rental and sale of its products. The Company continues to have an agreement (terminable by either party upon advance notice) with Anthem making the Company part of the Anthem network. Neither Anthem nor the Company has indicated that it will terminate this agreement. The Company also continues to provide its products to Anthem insureds, including products which may be used to treat insureds with the same medical conditions as those using devices subject to the claim.

*          *          *          *

The rate of increase in rental revenue slowed in the third quarter of 2008 because we did not recognize revenues (approximately $1,075,000) from the rental of certain devices to insureds of Anthem Blue Cross Blue Shield during the quarter due to a refund claim of Anthem which was settled in November 2008.

48.     The Company's November 20, 2008 press release, which the Individual Defendants caused the Company to issue, also confirmed the false and misleading third quarter of 2008 financial results and contained additional false and misleading statements. In the press release, Sandgaard stated, in pertinent part: "Sales and rentals to date in the fourth quarter of 2008 continue at a strong pace, and our internal projection for net revenue in the fourth quarter is in excess of $7,000,000." As was revealed in the Company's April 15, 2009 restatement, Zynex's actual fourth quarter of 2008 revenue was only $3,935,640 (or only 56% of Sandgaard's unsubstantiated $7,000,000 projection).

49.     As was revealed in the Company's Form 8-K filed with the SEC on November 24, 2008, Zynex's improper overbilling practices also forced the Company to agree to a less

favorable credit agreement with Marquette Healthcare Finance, with which the Company had

maintained a $3,000,000 line of credit.  The Form 8-K stated, in pertinent part:

> Zynex, Inc. has obtained a waiver of a financial covenant in its line of credit with
> Marquette Healthcare Finance.  The covenant was not satisfied as of September
> 30, 2008 because of a previously disclosed claim and settlement of it.  In the
> waiver, Marquette stated that it will not take action on the financial covenant
> default for the quarter ending on that date.
>
> Marquette also stated in the letter that it will re-set the covenant for upcoming
> quarters to reflect the impact of the settlement on projected revenues for the
> remainder of 2008 and future years.  In addition, Marquette and Zynex amended
> the interest rate under the line of credit from a floating prime rate plus 2.5% to the
> higher of (a) a floating prime rate plus 2.5% or (b) the floating LIBOR rate plus
> 4.5%.

### C.    The Truth is Revealed

50.    On April 1, 2009, the Company for the first time revealed the true extent of its

improper revenue recognition practices, announcing in its Form 8-K filed with the SEC and an

accompanying press release that Zynex had "concluded that Zynex's unaudited financial

statements for the quarters ended March 31, 2008, June 30, 2008, and September 30, 2008,

including its quarterly reports, should be revised to reflect adjustments to Zynex's allowance for

provider discounts, accounts receivable and net revenue for such periods." The Company

indicated that the need for restatement was "determined after an evaluation of adjustments

identified in connection with the 2008 year-end closing and the audit of the 2008 financial

statements."  Zynex instructed investors that its financial statements and press releases covering

those periods "should not be relied upon."

51.    As more fully discussed in Zynex's 10-K Report for fiscal year 2008, filed with

the SEC on April 15, 2009, the restatement resulted in a reduction of reported net revenues and

related net accounts receivable of approximately $5.1 million, with most of the adjustments being applied to the first three quarters of 2008.  According to Zynex, the restatement was necessary "based on a re-evaluation of the estimated allowance for provider discounts that management believes should have been utilized in 2008."  The Company, admitting it applied improper provider discount rates, further stated that the "change in the provider discount rates is based on management's analysis of business conditions, recent rates of collection and additional methodologies that the Company applied in estimating these rates at year end, which management believes are more accurate than previously applied rates during the quarterly periods in 2008.  Zynex's allowance for provider discounts is recorded to account for the risk of non-payment arising from reimbursements from insurance providers that are less than amounts claimed, amounts subject to patients' deductibles and benefit denials."  In essence, during the first three quarters of fiscal year 2008, Zynex recorded and reported revenue on product shipments for which insurers had not authorized billing and for which insurers had never agreed to pay the amounts billed.  Consequently, Zynex was only collecting a small fraction of the amounts billed and publicly reported as revenue.

52.     Rather than the dramatic reported revenues for the first three quarters of fiscal year 2008 of $3.74 million, $5.05 million, and $3.50 million, respectively, Zynex's actual revenues for the periods, as restated, totaled a modest $2.59 million, $3.04 million, and $2.20 million, respectively.  Thus, instead of year-over-year revenue growth of 2.5 times over the 9-month span, the Company witnessed 58% revenue growth compared to fiscal year 2007, as depicted below:

| | 2007 Net Rental and Sales Revenue | 2008 Net Rental and Sales Revenue (as originally filed) | 2008 Net Rental and Sales Revenue (as restated) |
|---|---|---|---|
| Q1 | $1,336,731 | $3,741,028 | $2,588,720 |
| Q2 | $1,505,207 | $5,047,635 | $3,040,460 |
| Q3 | $2,104,446 | $3,502,994 | $2,198,738 |
| Total | $4,946,384 | $12,291,658 | $7,827,919 |

53.     The revenue adjustments drastically impacted the Company's reported net income.  Indeed, rather than the robust net income for the first three quarters of fiscal year 2008 of $1.2 million, $1.9 million, and $0.2 million, Zynex's actual net income for the periods, as restated, totaled only $0.2 million, $0.3 million, and a loss of $0.4 million, respectively.  Thus, instead of year-over-year net income nearly tripling over the 9-month span, the Company barely produced a profit and made only 13% of what it did over the same period in 2007, as depicted below:

| | 2007 Net Income | 2008 Net Income (as originally filed) | 2008 Net Income (as restated) |
|---|---|---|---|
| Q1 | $231,681 | $1,192,991 | $230,683 |
| Q2 | $351,548 | $1,852,212 | $289,037 |
| Q3 | $614,465 | $205,837 | ($366,419) (loss) |
| Total | $1,197,694 | $3,251,040 | $152,301 |

54.     As was revealed in the Company's Form 8-K filed with the SEC on April 7, 2009, the April 1, 2009 revelation of Zynex's systemic improper overbilling practices again forced the Company to agree to a less favorable credit agreement with Marquette Healthcare Finance, with which the Company had maintained a $3,000,000 line of credit.  The Form 8-K stated, in pertinent part:

> With respect to Zynex's recently announced restatement of financial statements for the first three quarters of 2008, Marquette has waived any breach of a representation, warranty or covenant concerning the accuracy of the original unaudited financial statements for these quarterly periods. Notwithstanding such waiver, Marquette expressly reserved any right to declare a default, and any other claim, right or remedy with respect to (a) the restated financial statements for these quarterly periods; and (b) any fraud or intentional misrepresentation in connection with the original financial statements for these quarterly periods.

> Marquette and Zynex will amend the line of credit to increase the margin to 3.25% and increase the collateral monitoring fee to $1,750 per month.  The interest rate for the line of credit is the margin plus the higher of the (i) a floating prime rate; or (ii) the floating LIBOR rate plus 2%.

### THE INDIVIDUAL DEFENDANTS HAVE DAMAGED ZYNEX

55.     The accounting scandal at Zynex has damaged the Company.  As a result of the Individual Defendants' breaches of fiduciary duty and other improprieties, Zynex disseminated improper financial statements, which have damaged Zynex's credibility, as reflected by the Company's market capitalization loss of over $19 million, or 57% of the Company's total market capitalization, following the announced restatement.  Defendants knew that their acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Zynex's securities and would artificially inflate the prices of those securities.  Zynex's stock reached a price of $6.14 per share during the Relevant Period, yet

traded at $0.46 per share after the full truth regarding the Company's revenue transactions was finally disclosed.  Defendants' actions have further damaged Zynex's corporate image and goodwill.  For the foreseeable future, Zynex will suffer from what is known as the "liar's discount," a term applied to the stocks of companies which have been implicated in improper behavior and have misled the investing public, such that Zynex's ability to raise equity capital or debt on favorable terms in the future or secure business partners is now impaired.

56.     The precipitous decline in Zynex's stock price as a direct result of the Individual Defendants' conduct has exposed the Company to a substantial risk of liability for violations of the federal securities laws.  *See Mishkin et al. v. Zynex, Inc. et al.*, No. 09-cv-00780 REB-KLM (D. Colo. filed April 6, 2009).  Zynex has expended, and will continue to expend, significant sums of money defending the Company, Sandgaard, and Allison in that action.  These consequent costs and expenses must be paid by the Company as a direct and proximate result of the Individual Defendants' breach of their fiduciary duties.  Moreover, Zynex has already incurred these costs and expenses and therefore the harm caused to Zynex has already been realized.  These damages caused by defendants' failure to live up to their fiduciary duties owed to Zynex are not contingent upon the outcome of the securities class action.

57.     The investors' recent victory in *Mishkin*, in which the Court held that the plaintiffs satisfied the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995, substantially increases the likelihood of Zynex facing securities fraud liability for issuing false and misleading statements at the behest of defendants in that action.  Indeed, on March 30, 2011, U.S. District Judge Robert E. Blackburn denied a motion to

dismiss the investors' class action lawsuit for violations of the Securities Exchange Act of 1934 §10-b, Rule 10b-5, and §20(a) filed against Zynex and defendants Sandgaard and Allison, finding that plaintiffs had sufficiently pled that Sandgaard and Allison knowingly misled the market, causing substantial losses to class members identified in the complaint when the truth emerged.  Judge Blackburn found that plaintiffs' allegations supported "a reasonable conclusion that the defendants knew that Zynex's relevant statements to the public concerning Zynex's revenue and profits were materially false because those statements were based on the intentionally inflated amounts billed to insurance companies, as opposed to reasonable estimates of the payments Zynex actually would receive."  *See Mishkin et al. v. Zynex, Inc. et al.*, No. 09-cv-00780 REB-KLM, Order Denying Motion to Dismiss at 12 (D. Colo. March 30, 2011).  Judge Blackburn further found that the "alleged direct participation of Sandgaard and Allison in these practices supports a strong inference of scienter, as does the magnitude of the corrections to Zynex's financial statements once Zynex recognized publicly that it could not collect anything close to the amounts routinely billed to insurers." *Id.*  Therefore, as a direct and proximate result of the Individual Defendants' improper conduct, there exists a substantial threat of Zynex incurring millions of dollars worth of costs, expenses, and damages.

58.     As a result of the Individual Defendants' improper behavior, defendants have also proximately caused Zynex to incur significant costs from compensation and benefits paid to the defendants, as alleged herein, in breach of their duties to Zynex.

## DERIVATIVE ACTION ALLEGATIONS

59.     Plaintiff brings this action derivatively pursuant to Federal Rule of Civil

Procedure 23.1 in the right and for the benefit of Zynex to redress injuries suffered, and to be

suffered, by Zynex as a direct result of breaches of fiduciary duty by the Individual Defendants,

and which Zynex has failed to enforce.

60.     Plaintiff will adequately and fairly represent the interests of Zynex in prosecuting

its rights.  Plaintiff has no interest adverse to Zynex, and has hired counsel experienced in this

type of litigation.  The wrongs complained of herein occurred during the Relevant Period, during

which time plaintiff was a Zynex shareholder.  Plaintiff continues to hold Zynex shares.  Hence,

plaintiff has standing to bring this derivative action on behalf of the Company to recover

damages for all of the conduct described herein.

## DEMAND IS EXCUSED FOR FUTILITY

61.     Plaintiff has not made any demand on the board to institute this action because

such a demand would be a futile, wasteful, and useless act.  Such a demand is therefore legally

excused.

62.     The board of Zynex at the time of the original filing of this action consisted of the

following four individuals: Sandgaard, Simonton, Vitale, and Mats Wahlström.  Each of the

three members of Zynex's board of directors who are named as defendants in this action, due to

his or her participation in the wrongful acts alleged and potential individual financial exposure, is

not disinterested and cannot exercise independent business judgment on the issue of whether

Zynex should prosecute this action.  These three director defendants knew of the unlawful acts alleged herein, participated in the actions of their colleagues, and failed to prevent, detect, and halt these breaches of fiduciary duty.  These directors, comprising a majority of Zynex's current board of directors, would never sue themselves or their colleagues to recover the damages Zynex has incurred.  As a result, demand on Zynex and its board of directors is futile and therefore excused.

63.     Demand is also excused because defendant Sandgaard is also a named defendant in the *Mishkin* federal securities class action.  In *Mishkin*, Judge Blackburn of the United States District Court for the District of Colorado recently upheld the investors' claims for violations of the Securities Exchange Act of 1934 §10-b, Rule 10b-5, and §20(a) against Sandgaard.  Consequently, Sandgaard faces a substantial likelihood of liability and is neither independent or nor disinterested in the outcome of this shareholder derivative action naming Sandgaard as a defendant.  Furthermore, if the Company pressed forward with its claims against the defendants in this case, then the Company's efforts could undercut or even compromise the defense of the securities class action, excusing demand.

64.     Demand is further excused because, although Zynex has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, the board of directors has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Zynex any part of the damages suffered thereby.

65.     Demand is also excused because defendant Sandgaard dominates and controls Zynex's board of directors.  Sandgaard was the Company's sole director until October 6, 2008,

when the size of Zynex's board of directors increased to three directors.  Previously, Sandgaard was Zynex's sole shareholder, and Sandgaard held 61% of the Company's stock during the Relevant Period.  According to Zynex's 10-K Report for fiscal year 2010, filed with the SEC on March 28, 2011, Sandgaard currently owns 58% of the Company's stock.  Zynex's 10-K Report for fiscal year 2011 further affirmed that the Company's "success depends to a significant extent upon the continued service of Mr. Thomas Sandgaard, our Chief Executive Officer and Founder."  The Company's 10-K Report for fiscal year 2011 also confirmed that Sandgaard continues to wield "the ability to control substantially all matters submitted to [the Company's] stockholders for approval, including: Election of [Zynex's] board of directors; Removal of any of [Zynex's] directors; Amendment of [Zynex's] certificate of incorporation or bylaws; Approval of significant corporate transactions, such as a sale, merger or liquidation of our Company; and Adoption of measures that could delay or prevent a change in control or impede a merger, takeover or other business combination involving [Zynex]."  The Company's 10-K Report for fiscal year 2008 disclosed that, "Mr. Sandgaard, because of his stock ownership and position as director, may be considered a 'parent' of the Company."  Sandgaard has consolidated power in himself by ensuring that he is Zynex's Chairman and Chief Executive Officer.  By virtue of these positions, Sandgaard controls Zynex's daily operations, board of directors meetings, and books and records.  Further, Sandgaard's overwhelming 58% voting power, combined with his executive position, gives Sandgaard unfettered influence to nominate, elect, and remove Zynex's directors.  In a telling example of Sandgaard's control over the Zynex board of directors, as was revealed in the Company's 8-K Report filed with the SEC on April 6, 2011, less than a week after the securities class action complaint was upheld against Sandgaard for violations of the

federal securities laws, the purportedly independent members of Zynex's board approved a $61,000 raise to Sandgaard's base salary.  Thus, due to Sandgaard's domination and control, a demand on defendants Simonton and Vitale and director Mats Wahlström is futile.

66.     As Sandgaard was actively involved in the day-to-day management of Zynex and was directly responsible for the acts and omissions described herein, including the false and misleading statements made in press releases and SEC filings, Sandgaard is not disinterested and cannot exercise independent business judgment on the issue of whether Zynex should prosecute this action.

67.     The members of the Company's Audit Committee during the Relevant Period, defendants Simonton and Vitale, themselves comprising one half of the board, are incapable of impartially considering a demand for the additional reason that each bears responsibility for reviewing the integrity of Zynex's auditing, accounting, and reporting processes and consideration and approval of appropriate changes.  Defendants Simonton and Vitale were also responsible for reviewing Zynex's financial reports and other financial information provided to shareholders and filed with the SEC, in addition to reviewing Zynex's internal controls.  By virtue of their assigned duties and responsibilities, the Audit Committee defendants had a special relationship with the Company.  The Audit Committee Charter, in effect since October 6, 2008, specifically provides that the committee's "primary responsibility…is to oversee the Company's financial reporting processes on behalf of the Board and report the results of its activities to the Board."  The charter further provides that the "Committee, in carrying out its oversight responsibilities, will assess the Company's systems of internal accounting and financial controls,

any internal audit process…and the overall integrity of the Company's financial statements and information systems."  Further, the Audit Committee was "empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company."  Among the "principal recurring processes of the Committee" was the duty to "[r]eview with management and the independent auditor the interim financial statements to be included in the Company's Quarterly Report on Form 10-Q."  Also included in the "principal recurring processes of the Committee" was the duty to "[d]iscuss with management…the quality and adequacy of the Company's internal controls…"  As demonstrated by the Company's disclosures in April 2009, the Audit Committee members failed to live up to these responsibilities, and face a substantial likelihood of liability as a result.

68.    Among the additional facts demonstrating the futility of demand are the following:

(a)    in order to bring this action for breaches of fiduciary duty, the members of Zynex's board of directors would have to sue themselves, and/or their fellow directors and allies in the top ranks of the Company.  Annually, directors are paid considerable compensation for their service on the board of directors.  By way of example, for fiscal year 2010, Simonton and Vitale received cash and stock compensation of $57,665 and $42,165, respectively.  Sandgaard derives his livelihood from Zynex, which he would never jeopardize by investigating and pursuing claims of misconduct.  Given the financial interests in their positions, these

defendants would never jeopardize these amounts by pursuing the

Company's claims; and

(b)     the acts complained of herein constitute violations of fiduciary duties

owed to Zynex and its shareholders as well as violations of law and,

therefore, are incapable of ratification.  Because the director defendants'

actions were illegal and non-ratifiable, demand is excused as a matter of

law.

## COUNT I – BREACH OF FIDUCIARY DUTY AGAINST

## ALL INDIVIDUAL DEFENDANTS

69.     Plaintiff incorporates by reference the allegations set forth in the preceding

paragraphs.

70.     Each of the Individual Defendants was a director and/or officer of Zynex during

the Relevant Period, and as such owed to Zynex fiduciary obligations.  In violation of these

fiduciary duties of good faith, candor, and loyalty, the Individual Defendants failed to disclose,

or caused the Company to fail to disclose, material information and/or made material

misstatements to Zynex's shareholders regarding the Company's business, financial condition,

and revenue recognition.  These Individual Defendants knew that the statements about Zynex's

business, its financial condition, and revenue were false and misleading when made.  The

preparation and dissemination of inaccurate press releases alleged herein represents a failure by

the Individual Defendants to assure the existence within Zynex of appropriate and adequate

internal financial controls and a reasonable information and reporting system necessary to assure

the accuracy of the Company's financial reporting. Further, when put on notice that various insurers demanded rebates and credits amounting to millions of dollars as a result of Zynex's improper billing practices, the Individual Defendants had a fiduciary duty to promptly take appropriate action to correct the misconduct and prevent its recurrence.

71. Defendants willfully ignored obvious and pervasive problems with Zynex's internal controls alleged herein, and by deliberate and knowing indifference failed to make a good faith effort to correct the problems until it was far too late.

72. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Zynex shareholders materially inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures. These actions could not have been a good faith exercise of prudent business judgment.

73. Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision. By virtue of their conduct alleged herein, the Individual Defendants engaged in intentional misconduct, fraud, and knowing violations of law.

74. As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Zynex has sustained significant damages, not only monetarily as alleged herein, but also to its corporate reputation and goodwill.

75. As a result of the misconduct alleged herein, defendants are liable to Zynex.

## COUNT II – CONTRIBUTION AND INDEMNIFICATION AGAINST ALL
## INDIVIDUAL DEFENDANTS

76.     Plaintiff incorporates by reference the allegations set forth above.

77.     Zynex is alleged to be liable to private persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Zynex.

78.     Zynex's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

79.     Zynex is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against Zynex by virtue of the Individual Defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Zynex, demands judgment against defendants and each of them jointly and severally as follows:

A.     determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of Zynex for said action;

B.     declaring that each of the Individual Defendants breached his or her fiduciary duty to Zynex;

C.      determining and awarding Zynex the damages it sustained as a result of the violations set forth above and restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.      granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

E.      determining and awarding Zynex the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, as set forth above, from each of the Individual Defendants, jointly and severally, together with interest thereon;

F.      directing Zynex to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

G.      awarding plaintiff the costs and disbursements of this action, including reasonable fees and costs to plaintiff's attorneys, accountants, and experts; and

H.      granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all issues so triable.

Dated: July 28, 2011                CHARLES LILLEY & ASSOCIATES, P.C.

                                    s/  Charles W. Lilley_____
                                    Charles W. Lilley
                                    730 17th Street, Suite 670
                                    Denver, Colorado 80202
                                    Telephone: (303) 293-9800
                                    Facsimile: (303) 298-8975
                                    Email: clilley@lilleylaw.com

                                    Robert C. Schubert
                                    Willem F. Jonckheer
                                    Dustin L. Schubert
                                    SCHUBERT JONCKHEER & KOLBE LLP
                                    3 Embarcadero Center, Suite 1650
                                    San Francisco, California 94111
                                    Telephone: (415) 788-4220
                                    Facsimile: (415) 788-0161
                                    Email: rschubert@schubertlawfirm.com
                                    Email: wjonckheer@schubertlawfirm.com
                                    Email: dschubert@schubertlawfirm.com

                                    Laurence Rosen
                                    Phillip Kim
                                    THE ROSEN LAW FIRM, P.A.
                                    275 Madison Avenue, 34th Floor
                                    New York, New York 10016
                                    Telephone: (212) 686-1060
                                    Facsimile: (212) 202-3827
                                    Email: lrosen@rosenlegal.com
                                    Email: pkim@rosenlegal.com

                                    *Attorneys for Plaintiff*

PLAINTIFF:
Stephen T. Hatch
3814 45th Ave NE
 Tacoma, WA, 98422